## Case No. 6,946.

### HUSSEY v. BRADLEY et al.

[5 Blatchf. 134; 2 Fish. Pat. Cas. 362; Merw. Pat. Inv. 89.] [1]

Circuit Court, N. D. New York. March 24, 1863.

#### PATENTS—RE-ISSUE—EFFECT.

1. In deciding upon an application for the re-issue of letters patent, and upon the question whether the invention claimed in the reissue is the same invention which was intended to be patented on the original application, the commissioner of patents is not confined to the claims, nor even to the examination of the evidence furnished by the specification, models and drawings accompanying the original application, but any legal proof to show it to be the same invention should be received.

2. The decision of the commissioner of patents upon the question is prima facie evidence of such fact, and the subsequent inquiry, when the question is presented to a court and a jury, is limited to the question of fraud in the surrender.

3. Even a statement, in an original patent, that a part is old, or a disclaimer of a part, does not necessarily prevent such part from being claimed in a reissued patent, though it would have that effect if made advisedly, and not by inadvertence, accident, or mistake.

4. Letters patent were granted to Obed Hussey, the inventor. August 7th, 1847, for "a new and useful improvement in reaping machines," and were reissued April 14th, 1857, in three reissues, granted to him, and numbered 449, 450, and 451. Reissue No. 450 was reissued June 21st, 1859, in two reissues, granted to him, and numbered 742 and 743. Reissue No. 743 was reissued February 28th, 1860, in a reissue, granted to him, and numbered 917: *Held*, that reissues Nos. 449, 742, and 917 were properly granted, and cover only inventions made prior to, and intended to be patented under, the original application: that such inventions are new and useful and patentable; and that the inventor did not lose his right to a reissue by any laches, or any abandonment or dedication to the public of any of the inventions.

5. The invention covered by reissue No. 449 was not put on sale by the inventor, or with his consent, two years prior to his application for his patent.

6. In ordinary cases of reissue, the action of the commissioner of patents has more than prima facie influence, when the question of identity of invention is brought up for judicial decision, and, in all cases, a judge may well rely upon the commissioner's decision, to dispel doubts, or confirm his own impressions, upon the question of identity of devices or inventions.

7. The prior use of an invention, under a defective patent, cannot take away the right to a reissue of it, or authorize the use of the invention by others, after the reissue.
[Cited in M'Williams Manuf'g Co. v. Blundell, 11 Fed. 421.]

8. A reissued patent is generally considered, except in respect to infringements prior to its issue, as if granted at the date of the original patent, and is made to take effect, in respect to subsequent infringements, as though it had been

1 [Reported by Hon. Samuel Blatchford, District Judge, and by Samuel S. Fisher, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 5 Blatchf. 134, and the statement is from 2 Fish. Pat. Cas. 362. Merw. Pat. Inv. 89, contains only a partial report.]

originally issued in its reissued form, even though the original patent was invalid.

[Cited in Sarven v. Hall, Case No. 12,369.]

9. Where H., a defendant in an equity suit for the infringement of letters patent, was shown to have been merely a licensor to his co-defendant B., under patents owned by H., for improvements covered by those patents and embodied in the infringing machine, and it did not appear that H. had any other connection with, or derived any other profit from, the infringement by B., the bill was dismissed as to H., but without costs.

This was a bill in equity, filed to restrain the defendants [Christopher C. Bradley and others] from infringing letters patent [No. 5,227] for an "improvement in reaping machines," granted to Obed Hussey, August 7, 1847. reissued April 14, 1857, in three divisions, numbered 449, 450, and 451. Reissue 450 was reissued June 21, 1859, in two divisions, numbered 742 and 743. Reissue 743 was reissued February 28, 1860, and numbered 917. The patentee having deceased, reissues No. 449, 451, 742, and 917 were extended to complainant [Eunice B. Hussey] for seven years from August 7, 1861. The defendants were charged with infringing reissues No. 449, 742, and 917. A portion of the specification and claims of the original patent and reissue 449, will be found in the report of the case of Hussey v. McCormick [Case No. 6,948]. and in the opinion of the court in the present case. It is only deemed necessary to repeat the claims of the several patents in their order.

The claims of the original patent of 1847, afterward reissued as 449, 450, and 451, were as follows: "I accordingly claim the opening above the blades at (A) Fig. 3, and at D, Fig. 1, in combination with the vibrating blades. I also claim the particular application of the flush edge, at the fork of the blades, for the purpose described. The end and design of the improvements above claimed is to prevent the blades choking."

The claims of the reissues were as follows: Reissue 449: "I claim as my invention, a combination of a vibrating scalloped cutter, the indentations of whose edges act as a series of moving shear blades, with slotted guard fingers, the sides of which act as a corresponding series of fixed shear blades; the parts of such fingers forming the slot, being connected at the front end only, leaving the rear of the slot open and free for the escape of material that would otherwise clog the cutter, substantially as described." Reissue 450, afterward reissued as 742 and 743: "I claim," etc., "the improved beveling of the edges of the blades of scalloped sickles, as herein described." Reissue 742: "I claim as my invention the combination of side and cross-bearings of the guards, with flush edges at and near the forks of the blades, substantially as described." Reissue 743, afterward reissued as 917: "I claim," etc., "scalloped cutters with their blades beveled, as herein described." Reissue 917: "What I claim,"

etc., "is the combination of the finger beam (without a platform)—the short open slot fingers having small projection below the cutter—the scalloped cutter and the guides for the cutter; these parts being constructed and combined substantially as described, the cutter vibrating in a straight line, each scallop having an edge sliding in close proximity to an angular corner of the finger, and forming therewith a nipping angle, substantially as described."

Hussey, in 1833, invented the scalloped vibrating cutter, operating through slots in numerous short iron fingers which projected before the blades, separated the grain and acted as stationary shear blades, against which the scallops, acting as moving shear blades, severed the stalks of grain. The parts of the fingers forming the slots were, however, fastened in front and rear of the blades, and it was found, in practice, that the cut grass, etc., would work into the slots, pass back between the top or bottom of the finger and vibrating blades; and, being unable to escape, would choke or clog the cutter. In 1847, therefore, Hussey opened the slot, by cutting a hole through the top part of the finger, just over the rear of the blade, or rather, by fastening the top part of the finger securely in front and allowing it to remain unfastened in the rear, so that the clogging matter, as it worked back, would work out. This constituted the invention described in reissue 449. A light iron rod, connecting the fingers and bracing them below the vibrating blades, for which it served as a guide, constituted the invention described in reissue 742. Reissue 917 was for a general combination of the parts.

The defendants relied mainly upon the want of novelty of the several improvements. They introduced proof that, in 1834, Enoch Amber had made and sold mowing machines with open slotted fingers and straight knives; that, in 1844, one Nicholson had patented open slotted fingers and revolving knives, with bill-hook or scalloped cutters; that, in 1840, Hiram Moore had constructed and used harvesting machines, which, being designed to cut off the heads of the grain only, were provided with scalloped vibrating cutters, working in slots in long wooden fingers, the parts forming the slot being made of heavy hoop iron, the upper piece of which was unfastened in the rear so as to afford an opening; and that, John Leland, in 1846, had made and used knives and fingers identical with those patented to Hussey in 1847. It was also insisted that the reissued patents were not for the same invention as the original, and that the reissues were obtained too late.

George Gifford and E. W. Stoughton, for complainant

G. M. Lee and S. S. Fisher, for defendants.

Before NELSON, Circuit Justice, and HALL, District Judge.

HALL, District Judge. We can discover no just ground for maintaining that the reissued patent No. 449, of April 14th, 1857, was not proper as a reissue of the original patent of August 7th, 1847, if the patentee was the original and first inventor of the combination therein claimed, and if his rights had not been forfeited or destroyed by the lapse of time between the issue of the first patent and this reissue.

The same remark might, perhaps, have been applied, without further discussion, to the reissues No. 742, of June 21st, 1859, and No. 917, of February 28th, 1860, had not these last reissues been preceded by the reissue No. 450, of April 14th, 1857, and the reissue No. 917 also been preceded by the reissue No. 743, of June 21st, 1859. The claim in the reissue No. 450 is quite limited, and is in the following terms: "I claim as my invention, and desire to secure by letters patent, the improved beveling of the edges of the blades of scalloped sickles, as herein described." This patent was surrendered and reissued as Nos. 742 and 743; and No. 743, in which the claim was in the following terms: "I claim as my invention, and desire to secure by letters patent, scalloped cutters, with their blades beveled, as herein described," was afterwards surrendered and reissued as No. 917. Looking only to the claims in Nos. 450, 742, 743, and 917, it would certainly be difficult to find any evidence that Nos. 742 and 917 were for the same invention as that specifically claimed in No. 450. Indeed, a comparison of the language of these claims would seem, in the absence of all other proof, to repel such an allegation. But it is well settled, that, in deciding upon these applications for a reissue, and upon the question whether the invention claimed in the reissue is the same invention which was intended to be patented on the original application, the commissioner of patents is not confined to the claims, nor even to the examination of the evidence furnished by the specification, models, and drawings, accompanying the original application; and that any legal proof to show it to be the same invention should be received. Ex parte Ball [Case No. 812]; Ex parte Dyson [Id. 4,228]; and Wilson v. Singer [Id. 17,835]. It is, also, well settled, that the decision of the commissioner of patents upon the question, is prima facie evidence of such fact, and that the subsequent inquiry, when the question is presented to a court and a jury, is limited to the fairness of the transaction—to the question of fraud in the surrender. Philadelphia & T. R. Co. v. Stimpson, 14 Pet. [39 U. S.] 448, 458, 459; Stimpson v. Westchester R. Co., 4 How. [45 U. S.] 380, 404; O'Reilly v. Morse, 15 How. [56 U. S.] 62; Battin v. Taggert, 17 How. [58 U. S.] 74, 84; Woodworth v. Stone [Case No. 18,021]; Day v. Goodyear [Id. 3,678]. Even a statement in an original patent, that a part is old, or a disclaimer of a part, does not, it seems, necessarily prevent such part from being claimed in a reissued patent, though it would have that effect if made advisedly, and not by inadvertence, accident, or mistake. Ex parte Hayden [Id. 6,256], and Hayden v. James [Id. 6,260]. On the application for these reissues, the former claims and specifications and the original model and drawings were, of course, before the commissioner. It is shown by the testimony of Mr. Renwick, an expert, that all the devices covered by these three reissued patents are contained in the original model, and we have no means of knowing what other proof was furnished to the commissioner, or of determining that such other proof, considered in connection with such model, was not entirely conclusive upon the points of inadvertence, accident, or mistake, and of an intention to patent originally the inventions covered by the reissued patents. No proof of fraud, unfairness, or falsehood, in respect to these applications for reissues, has been given; and, in the absence of such proof, we are bound, under the authorities cited, to presume that such reissued patents were properly issued, and that they do, in fact, cover only the inventions made prior to, and intended to be patented under, the first application. See, also, French v. Rogers [Id. 5,103].

It was urged by the defendants, not only that these reissues were needless and improper, but also that they were void on their face, as showing nothing patentable. We can find no solid ground upon which to maintain either of these objections, and shall, therefore, pass to the other questions in the case. In the discussion of such questions, we shall refer to further authorities, which, as well as some hereinbefore referred to, will show, to some extent, at least, the grounds upon which the questions just referred to have been disposed of.

The patents themselves are prima facie evidence of the novelty and utility of the inventions patented; but the defendants are at liberty to show, by other proof, that they are neither new nor useful. The utility of the inventions claimed is not, we believe, seriously questioned, and we may, therefore, properly address ourselves to the questions of novelty, which have been seriously contested, and which certainly require careful examination.

It was insisted, by the learned counsel for the defendants, that the reissued patent No. 449 is void, for want of novelty; and that the invention claimed in the specification annexed to that patent was anticipated by Hussey, in 1833; by Ambler, in 1834; by Moore and Hascall, in 1839; by Nicholson, in 1844; and by Leland, in 1846. We think that neither of these objections urged by the counsel can be maintained. The invention claimed is the combination of a vibrating scalloped cutter, the indentations of whose edges act as a series of moving shear

blades, with slotted guard fingers, the sides of which act as a corresponding series of fixed shear blades, the parts of such fingers forming the slot being connected at the front end only, leaving the rear of the slot open and free for the escape of material that would otherwise clog the cutter, substantially as described.

There certainly was no such combination in Hussey's patented invention of 1833. In his specification annexed to that patent, he says, that "the saw teeth should play clear of the guards, both above and below," and the mode of construction specified makes provision for securing, as far as possible, this particular result; and, in the claim, at the close of the specification, he claims "the peculiar construction that the saw teeth may run free, whereby the necessary pressure and consequent friction of the two corresponding edges, cutting together as on the principle of scissors, is entirely avoided." The vibrating scalloped cutter and the slotted guard fingers, mentioned in the patent of 1847, are differently constructed and arranged for the express purpose of securing the effect, in substance, of the friction and pressure of two corresponding edges cutting together, as on the principle of scissors, making the combination, in this respect, different, in its mode of construction, operation, and results, from that exhibited in the apparatus described in Hussey's patent of 1833. But this is not all, nor is it, in fact, the most important improvement in Hussey's patent of 1847. The open slotted guard finger is not found in the invention patented in 1833; and, as the change in the form and operation of this slotted finger is of very great importance, both in the reaper and in the mower, the invention of Hussey, patented in 1847, was very different from, and a great improvement upon, his invention patented in 1833. The shearing action produced by the different grinding or beveling of the cutters, and the different arrangement of the cutters and fingers, and the opening in the guard finger, were not embraced or described in the patent of 1833.

The Ambler machine of 1834, as described in his patent, or as presented by the evidence, certainly contained no such combination. Ambler's cutter was a straight and not a scalloped cutter, and no shearing action was or could be produced in its operation. His barbed guard fingers were, also, quite different from the open slotted guard fingers of Hussey, and, if they could be used with a scalloped cutter, could not have produced the same results.

Moore and Hascall's machine of 1839, as described in the patent, or as actually constructed, did not embody this invention. There was no combination of vibrating scalloped cutters, operating as moving shear blades, with open slotted guard fingers operating as fixed shear blades; and the same remark is applicable to the Nicholson machine of 1844. The guard fingers of Moore and Hascall's machine were in no sense substantially like those of Hussey, and they may doubtless be used by the defendants without an infringement of Hussey's patent. Moore and Hascall's guard fingers resemble the tusks of an elephant more than they do the guard fingers of Hussey.

The Leland machine, in regard to the parts of Hussey's machine embraced in patent No. 449, was substantially like Hussey's machine, but there is no evidence that Leland's machine, embodying this invention, was constructed, or even invented, until May or June, 1846; and the evidence of Lovegrove shows, that, on his return to Baltimore, after the harvest of 1844, and in the month of August of that year this invention of Hussey was explained to him by Hussey, and that Hussey then showed him the open slotted guard finger, forged strong and solid at the outer end, and not allowing the part of the finger above the slot to go back to the rod by about an inch, and that, in October or November, Hussey showed him a machine in which these improvements were embodied. Although this machine could not be practically and fully tested until the harvest of the next year, this evidence shows that Hussey antedates Leland in this invention.

But it is said, that this machine was on sale two years before Hussey's application for a patent; and that, therefore Hussey's patent is void. The evidence of Lovegrove, which is the only evidence to sustain this position, does not establish the fact claimed. He says that, in October or November, a single machine was complete, with the exception of the tongue or shafts; but there is no evidence to show when these were added, or when the machine was first offered for sale. It is certainly proved, that this machine was then in Hussey's factory, with other machines which he was selling, but it was incomplete, and had never been tried in the field; and the evidence of Lovegrove fails to show that this particular machine was ever offered for sale, or sold, although it is most probable that it was first tried and used in the harvest of 1845, and was afterwards sold during that year. Lovegrove testifies that, in December, 1844, he went to South America and was gone nine months, and had no idea what became of that particular machine. He further testifies, on his cross examination by the defendants, that, while in South America, he received a letter from Mr. Hussey, stating that he was going to try his first new cutters in the field, which he presumed was the machine referred to; and that Hussey was very cautious about alterations, and rarely built more than one machine, with much alteration, without trying it in the field. And this is all the testimony there is on this point. Hussey's application for his patent was made on the 17th of February, 1847, and his patent was granted August 7th, 1847. There

is, therefore, no proof that this invention was put on sale by Hussey, or with his consent, two years prior to his application for his patent. The burden of establishing, by satisfactory proof, the fact that this invention was on sale for two years prior to Hussey's application for a patent, is upon the defendants; and, most certainly, this fact is not proved by this evidence.

The reissued patent No. 742 is for a combination of side and cross bearings of the guards, with flush edges at and near the forks of the blades, substantially as described, and is for this only. It is insisted, by the defendants, that this patent is void for want of novelty, having been as they allege, anticipated by White, in or before 1837. The cutting apparatus of White, in which this invention, is alleged to be embodied, was made an exhibit, and has been examined in reference to this question of novelty. It has substantially the same side and cross-bearings of the guards as the Hussey machine, and it has a scalloped cutter with flush edges; but it is insisted by the plaintiff, that it does not present the same combination, because the separate plates, which together constitute the scalloped cutter, each plate forming a single projection of the tooth-formed cutter, were, as a general rule, placed on the cutter bar, with their flushed edges so arranged that only every other flush edge was uppermost, the alternate plates being placed on the bar with their flushed edges on their lower side. It is conceded that there were exceptions to this rule, there being, if we recollect rightly, in one case two, and in another three, of the adjoining plates, having their flush edges on the same upper or lower side, as they were fastened to such cutter bar. The evidence in the case shows, that a cutter bar constructed in this manner is much inferior to one constructed according to the specification of Hussey; that it chokes more rapidly and requires more frequent cleaning; and that the cutters and other parts of the machine are more likely to be broken or injured. It is quite certain, that Hussey's mode of arranging the cutter blades, with the flushed edges of each on the lower side, is so far preferable to the alternate arrangement, as to constitute a substantial difference in the practical operation of the machine. The White machines were substantially abandoned and given up. Those which the witnesses Foster and Williamson had, and on which this point in the defence rests, were not found so useful as to induce a continuance of their manufacture. At this day, it will hardly be contended, that White, or Foster, or Williamson, had discovered or appreciated the fact, that these cutter plates should be arranged in the manner adopted by Hussey. If the maker of the White machine had appreciated the advantages of this arrangement, he would certainly have adopted it, as it was as easy to manufacture the machine with the uniform arrangement of the cutter plates, as it was to. manufacture it with the alternate or promiscuous arrangement presented in the cutting apparatus of that machine. As these differences are matter of substance, and as we think the patent of Hussey may properly be so construed as to give such effect to the words, "substantially as described," as to require this uniformity of arrangement, we have concluded, after some hesitation, that the proof of the prior existence of the White machine does not avoid patent No. 742. This view of the question is sustained by the decision of the commissioner of patents, on the application for the renewal of this patent, the commissioner having then decided that the White machine did not contain the same combination as that claimed in this patent. Indeed, the favorable opinion of the commissioner of patents upon the applications for the renewal of the several patents of Hussey under which the plaintiff proceeds in this suit, covers most of the questions now raised and decides them in favor of the plaintiff. In French v. Rogers [Case No. 5,103], Judge Kane held, that, in ordinary cases of reissue, the commissioner's action has more than prima facie influence, in deciding the question of identity of invention; and, in all cases, a judge may well rely upon the commissioner's decision, to dispel doubts, or confirm his own impressions, upon the question of identity of devices or inventions.

The reissued patent No. 917 is for a combination of the finger beam (without a platform), the short, open slot fingers, having small projections below the cutter, the scalloped cutter, and the guides for the cutter. these parts being constructed and combined substantially as described, the cutter vibrating in a straight line, each scallop having an edge sliding in close proximity to an angular corner of the finger, and forming therewith a nipping angle, substantially as described.

The defendants insist that this patent also is void for want of novelty; and they allege that the invention was anticipated by Hussey's machine of 1833, by Ambler, by White, by Nicholson, and by Leland. If we are right in our conclusions heretofore expressed, this patent is not void for want of novelty; and certainly the combination now claimed is not found in any other of the machines proved to have been invented prior to Hussey's invention in the fall of 1844.

But it is said that all these reissues are too late, and that, if they cover more than the original patent protected, the exclusive right to the invention was lost by Hussey's laches of ten years, and that the public are rightfully in possession of the invention, by virtue of Hussey's laches and Leland's free gift. We cannot say, as matter of law, that these reissues were too late, nor is there any proof of fraud or laches upon which we can, on that ground, declare these reissued patents void. A reissue has been upheld when

the surrender was made more than sixteen years after the first patent was issued,—Gibson v. Harris [Case No. 5,396]; and it was there said, that a patent which had been extended to twenty-one years, under the general law, and afterwards extended to twenty-eight years, by special act of congress, might be surrendered and reissued, after the term of twenty-one years had expired. See, also, Woodworth v. Edwards [Id. 18,014]; French v. Rogers [supra]; and Goodyear v. Day [Case No. 5,566]. The fact, that a portion of these inventions was not claimed in the original patent, does not, as we have already shown, defeat the present claims of the patentee; and even a disclaimer, in the original patent, of an invention claimed in a reissued one, is not, without other proof, enough to avoid the reissued patent. Ex parte Hayden and Hayden v. James, supra. It is true, that, in the case of Batten v. Taggert [Case No. 1,107], Judge Kane decided, that if a patentee neglects, in his specification, to assert his invention as to a certain part, omits to claim specifically such part, and suffers his patent so to stand for a number of years, he cannot afterward surrender his patent and take a reissue, claiming such part, as the use under the former patent, without any claim, will be a dedication to the public. But this decision was overruled by the supreme court of the United States, in the same case (17 How. [58 U. S.] 74); and the cases bearing upon this question, to which we have already referred, are, we think, sufficient to show that we cannot, after the action of the commissioner of patents in respect to these patents, and without other proof, hold that there has been any abandonment or dedication to the public, of the inventions claimed in these reissued patents. Independently of the question of abandonment or dedication, it is well settled, that the prior use of an invention, under a defective patent, cannot take away the right to surrender such patent and take out a new and amended one, or authorize a use under an amended patent. Stimpson v. Westchester R. Co., 4 How. [45 U. S.] 380, 402; Goodyear v. Day [supra]; Carr v. Rice [Case No. 2,439]; Battin v. Taggert, 17 How. [58 U. S.] 74, 84. In law, a reissued patent is generally considered, except in respect to infringements prior to its issue, as if granted at the date of the original patent. Carr v. Rice [supra]. And the corrected patent, in respect to all subsequent infringements, is made to take effect as though it had been so issued originally, even though the original patent was invalid. Bloomer v. Stolley [Case No. 1,559]; Shaw v. Cooper, 7 Pet. [32 U. S.] 292, 315; Stanley v. Whipple [Case No. 13,286]; Smith v. Pearce [Id. 13,089]; Carr v. Rice [supra]. We cannot, under the authorities above cited, sanction the position, that these reissues came too late, or that the patentee had forfeited his rights by the delay in procuring reissues covering such portions of his invention as were not included in the claims annexed to his original patent of 1847.

This brings us to the questions of infringement; and, in respect to these questions, we have examined the cutting apparatus of the machines of the defendants Bradley and Bradley, which were made exhibits in the cause, and the testimony of experts produced by the respective parties. The scalloped vibrating cutter of those defendants is substantially like that shown in the reissued patents Nos. 449 and 917, the only material difference being, that the cutter plates or blades of the defendants' machine are beveled only on one side, from heel to point, while those of Hussey are beveled on both sides, at and near the point of the several cutter blades. This difference we do not, however, consider as essential, under the specifications and claims of these reissued patents. We think that the guard fingers in both machines are, in principle and mode of operation, the same. These two elements of the combinations found in the two machines are substantially the same; and we are, therefore, of the opinion, that the reissued patent No. 449 is infringed by the manufacture and sale of the machines made by the defendants Bradley and Bradley.

We are, also, of the opinion, that the combinations covered by the reissued patents Nos. 742 and 917 are found in these machines of the defendants. The side and cross bearings of the guards are not identical in form, but the change is only of a mechanical equivalent for the side and cross bearings of Hussey's guards; and, if patents can be avoided by changes of the character of those made by the defendants, the exclusive rights of patentees will be of but little practical value. If these conclusions are correct, a decree must be made against the defendants Bradley and Bradley.

But it is insisted, that no decree against the defendant Hubbard should be made in this suit, because he has no interest, except as a licensor, in the manufacture, by the defendants Bradley and Bradley, of the machines which infringe the plaintiff's patents, he receiving a license fee of ten dollars for each machine so manufactured, and because he does not encourage or aid in the manufacture, or receive any benefit therefrom, except as such licensor. The only proof of Hubbard's connection with the defendants Bradley and Bradley, is contained in the admissions in his answer; and, as we understand that answer, it states, in substance, that he is the holder of several different patents for improvements in reaping and mowing machines, and that he has simply licensed the defendants Bradley and Bradley to make and vend machines with such patented improvements, on paying him a license fee for each machine by them made and sold under such license. It is not shown what these patents cover, or whether these

licenses, in form or effect, have any connection with the infringements of the patents of the plaintiff. We think that, before we can make a decree against the defendant Hubbard, there must be some other proof to show that Hubbard has some connection with, or derives some profit from the infringements now complained of. For aught that appears, the improvements patented to Hubbard, and embraced in these licenses, are not at all connected with the infringements shown in this case, and we are, therefore, of the opinion, that the plaintiff's bill, so far as relates to Hubbard, must be dismissed; but, as he has probably indirectly derived advantage from the infringements complained of, by reason of the larger number of sales made by the Bradleys, in consequence of their machines being made more valuable and more saleable by the use of Hussey's improvements, and as all the defendants have joined in their defence, the bill as to Hubbard will be dismissed without costs.

As against the other defendants, there must be the usual decree for a permanent injunction and an account of the profits received by them in consequence of their infringement of the plaintiff's patents.

NELSON, Circuit Justice. I have examined the foregoing opinion, and concur in it.

[In Case No. 6,946a the costs of above proceeding were taxed. For other cases involving these patents, see note to Hussey v. Whitely, Id. 6,950.]